(C. D. 2028)

METALSTAND COMPANY, INC. *v.* UNITED STATES

United States Customs Court, Second Division

(Decided October 2, 1958)

*Schnader, Harrison, Segal & Lewis* (*Bancroft Haviland* of counsel) for the plaintiff.

*George Cochran Doub*, Assistant Attorney General (*Richard E. FitzGibbon*, trial attorney), for the defendant.

Before LAWRENCE, RAO, and FORD, Judges

RAO, Judge: Certain steel sheets, imported from Belgium, were classified by the collector of customs at the port of entry, as sheets of steel, common or black, valued at more than 3 cents per pound, and, accordingly, were assessed with duty at the rate of 10 per centum ad valorem, as provided for in paragraph 308 of the Tariff Act of 1930, as modified by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802. The collector also applied to this merchandise the provisions of paragraph 309 of said act, as modified by said trade agreement, wherein an additional duty of $\frac{1}{10}$ cent per pound is provided for sheets of iron or steel, which have been pickled or cold-rolled.

The protest of plaintiff herein is directed solely against the collector's action in imposing the additional duty specified in said paragraph 309, as modified, it being the contention of plaintiff that the steel sheets in issue were neither pickled nor cold-rolled. The basic assessment within the provisions of said paragraph 308, *supra*, is not here challenged.

That portion of said paragraph 309, as modified, which is pertinent to this action reads as follows:

Plates or sheets of iron or steel, by whatever name designated, other than polished, planished or glanced, which have been pickled or cleaned by acid or by any other material or process, or which are cold-rolled, smoothed only, not polished, shall be subject to_ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ $\frac{1}{10}$¢ per lb. more duty than the rates provided on corresponding thicknesses of common or black sheet iron or steel

The processes to which the instant steel sheets were subjected prior to importation are generally outlined in the following statement contained in so-called mill certificates attached to the several invoices here involved:

Hot Rolled soft Thomas Steel Sheets with customary rolling and shearing allowances, ordinary works, planing without reception test box annealed twice cold-rolled.

More specifically, they are described in the testimony of one Torsten Fritsche, managing director of the Belgian manufacturer of the instant

merchandise, elicited upon written interrogatories. He testified, upon being asked for the manufacturing procedures, that the material contained in each of the shipments here in issue "was processed from half products to sheets of the required thickness by hot rolling; after annealing the sheets were subject to two cold passes." This witness, who has been head of the iron and steel department of his company for 20 years, explained that if steel is reduced to the thicknesses and dimensions of the finished product in a hot condition, it is hot-rolled steel, but that if the reduction is accomplished upon material in a cold condition, it is cold-rolled steel. It was his opinion that the merchandise at bar was not cold-rolled steel, for the reason that the cold passes did not further reduce the thickness of the material, but were applied to assure perfect planing and to improve the surface of the sheets.

I. Alan Cohen, vice president of plaintiff company, was also of opinion that the merchandise at bar was not cold-rolled. He based his conclusion in part upon the fact that the price which he paid for the instant merchandise of $133 per metric ton, or between 6 and 7 cents per pound, represented the prevailing price of hot-rolled steel, and was considerably less than the 11-cent-per-pound price at which cold-rolled steel was then selling; in part upon the difference in the appearance of the two products.

He explained that hot-rolled steel has a scale and a pitted surface, caused by the carbon on the rollers employed to reduce the steel to a specified gauge, whereas cold-rolled sheets have no discoloration, scale, or pittedness, and are completely finished products.

Cohen, who has been buying and using steel for the past 11 years and is familiar with its production, also testified that the imported steel sheets were not pickled. He stated that his company manufactures steel office furniture—desks, filing cabinets, and the like—from steel sheets, and before the instant sheets could be used for such purposes they had to be pickled. In the pickling process, various acids remove the scale and pits and the bluish discoloration of the black steel sheets.

To illustrate the differences among hot-rolled steel, hot-rolled pickled steel, and cold-rolled steel, this witness produced and there were received in evidence as plaintiff's collective exhibit 2, plaintiff's exhibit 3, and plaintiff's illustrative exhibit 4, respectively, four pieces of steel. Collective exhibit 2 consists of cutoffs representative of the instant shipments; exhibit 3 is a piece of the imported steel, after pickling; and illustrative exhibit 4 is a section of cold-rolled steel.

On cross-examination, witness Cohen admitted that he had sent a portion of the importation at bar to the Metlab Co., a commercial analyst, which reported, in a letter introduced into evidence as

defendant's exhibit A, that the specimens examined would not be acceptable as cold-rolled stock, by reason of the presence of pits and other surface defects and the lack of a smooth, clean finish. It was also therein stated:

The present samples have an oxidized surface, blued in some areas and with a very light scale in other areas. Furthermore, large areas of the surface are covered with minute pits characteristic of material which has been hot-rolled and pickled.

Nevertheless, Cohen insisted that the sheets were not pickled prior to importation, by reason of their appearance and the fact that his company did not pay any additional charge for pickling.

The third witness for the plaintiff was John W. Fissel, a service metallurgist holding a bachelor of science degree in metallurgy, who has been employed by the United States Steel Corp. for the past 21 years. His duties generally require him to provide technical advice and service on metallurgical and quality matters to purchasers of the company's steel. The witness gave the following explanation of the distinction in the United States today between hot-rolled and cold-rolled steel sheets:

As the case in point, hot-rolled sheets are produced by hot reduction to finished thickness at temperatures usually in excess of 1200 degrees. Cold-rolled steel is a partially hot-reduced sheet, which is then de-scaled or pickled, and reduced at low temperature, usually under 3 or 400 degrees, to final thickness, reductions usually being in excess of approximately 25%. * * *.

\* \* \* \* \* \* \*

* * * To make a cold-rolled sheet with the surface quality that has come to be an accepted standard for cold-rolled sheets, a reduction is necessary—substantial reduction.

He further explained that hot-rolled sheets have an oxide or scale caused by the temperature of the rolling and heating operation, have minor imperfections and a less dense, more porous surface than cold-rolled steel, which has a lustrous surface relatively free of minor defects. These are properties which, this witness stated, are visible to the eye; and, after examining plaintiff's collective exhibit 2, he gave it as his opinion that they were unquestionably hot-rolled sheets, which were definitely not pickled after hot-rolling.

This witness expressed the view that hot-rolled sheets which have not been pickled but have been subjected to two cold passes would not become cold-rolled sheets. According to him, in the terminology of the industry, a cold pass means "a very minor amount of reduction; not a measurable amount of reduction. * * * The cold pass is a flattening or minor surface-smoothing operation. It's not cold reduction. Cold passing and cold reduction are not synonymous."

On cross-examination, Fissel stated that it was customary at the present time to subject hot-rolled steel sheets to one or two cold passes, primarily for the purpose of flattening and to smooth down

minor imperfections. Although he agreed that it was also customary to pickle the hot-rolled steel, very slightly, before the cold passes are made, he did not concede, nor was he asked to do so, that the instant sheets had been so treated.

No witnesses testified upon behalf of the defendant.

Upon the basis of this record, there can be little doubt that plaintiff has established, at least *prima facie*, that the subject steel sheets were not cold-rolled. The evidence to the effect that the cold-rolling process contemplates a substantial reduction in the dimensions of the material—a minimum of 25 per centum—and results in a finished product having a surface smoothness relatively free from defects, and a lustrous appearance, came from qualified witnesses, experienced in the field of steel production and was not controverted. Since the material was processed from half products to sheets of the required thickness by hot-rolling, it is self-evident that the steel was not reduced in dimensions by the cold passes.

Of passing interest in this connection is the following comment in the Summary of Tariff Information, 1929, prepared for the use of the Committee on Ways and Means, House of Representatives (page 646):

*Steel sheets*, one-pass cold-rolled, were held properly dutiable under paragraph 308 and not subject to additional duty under paragraph 309, because not cold rolled within the meaning of that term as used in that paragraph (C. I. E. 3697).

Even to the eye of the uninitiate, it is apparent that steel sheets of the kind here involved, as represented by plaintiff's collective exhibit 2, possess those characteristic indicia of hot-rolled steel to which plaintiff's witnesses adverted. They are scaly, bluish in spots, and slightly pitted, and markedly differ from the smooth shiny appearance of acknowledged cold-rolled steel, as evidenced by plaintiff's illustrative exhibit 4. Moreover, when compared with the same material after pickling, as shown by plaintiff's exhibit 3, they appear to be considerably darker and less finished looking.

The value of samples as mute but persuasive witnesses in customs litigation has long been recognized. *United States* v. *Bernard, Judae & Co.*, 18 C. C. P. A (Customs) 68, T. D. 44029; *United States* v. *Marshall Field & Co.*, 19 C. C. P. A. (Customs) 331, T. D. 45483; *American Express Company* v. *United States*, 39 C. C. P. A. (Customs) 8, C. A. D. 456.

We do not believe that the unqualified testimony in this case to the effect that the involved sheets were not pickled prior to importation has been seriously weakened, either by the general statement in defendant's exhibit A that the minute pits on the surface of the specimens submitted are characteristic of material which has been pickled, or the admission of the witness Fissel that it was customary to slightly pickle steel before subjecting it to cold passes. The facts are that

the Belgian manufacture made no reference to a pickling process; the American importer was not charged for such a process; it was necessary to have the sheets pickled after importation to prepare them for their ultimate use; and they presented a vastly different appearance after they were thus treated.

By reason of the foregoing, we find and hold that the merchandise at bar was not pickled or cleaned by acid, or by any other material or process, nor cold-rolled, prior to importation, and is, therefore, not subject to the additional duty of $\frac{1}{10}$ cent per pound provided for in paragraph 309 of the Tariff Act of 1930, as modified, *supra*. The claim in the protest to that effect is sustained.

Judgment will be entered accordingly.